UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICARDO ARANA,<br><br>                    Petitioner,<br><br>        v.<br><br>RANDY GROUNDS, Warden,<br><br>                    Respondent. | Case No.  11-cv-01972-JST (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY** |

Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Ricardo Arana, challenging the validity of a judgment obtained against him in state court.  Respondent has filed an answer to the petition, and petitioner has filed a traverse.[1]

## I.  PROCEDURAL HISTORY

On June 14, 2006, a San Mateo County jury found petitioner guilty of one count of first degree murder (Cal. Penal Code § 187(a)[2]), three counts of attempted murder (§§ 187(a), 664), and discharging a firearm at an occupied dwelling and motor vehicle (§ 246).  (Ex. 1 at 669-93.[3]) The jury further found that petitioner personally discharged a firearm causing death in connection with the murder (§ 12022.53(d)), that the murder was intentional and perpetrated by means of discharging a firearm from a motor vehicle (§ 190.2(a)(21)), and that petitioner personally

---

[1] Petitioner initially named Tim Virga, warden of California State Prison – Sacramento, as the respondent in this action.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Randy Grounds, the current warden of Salinas Valley State Prison, where petitioner is currently incarcerated, is hereby SUBSTITUTED as respondent in place of petitioner's prior custodian.

[2] Except as otherwise specified, all statutory references herein are to the California Penal Code.

[3] All references herein to exhibits are to the exhibits submitted by respondent in support of the answer.

United States District Court<br>Northern District of California

discharged a firearm during the attempted murders (§ 12022.53(c)).  (Id.)  On September 12, 2006, the trial court sentenced petitioner to an indeterminate term of life without the possibility of parole on the murder count and a determinate term of 45 years on the remaining counts.  (Ex. 1 at 727-28.)

Petitioner directly appealed the judgment in the California Court of Appeal.  On September 22, 2008, in a reasoned opinion, the California Court of Appeal affirmed the judgment.  (Ex. 8.)  On December 23, 2008, the California Supreme Court summarily denied the petition for review.  (Ex. 10.)

Petitioner next filed petitions for a writ of habeas corpus in the state superior, appellate, and supreme courts, all of which were denied.  (Exs. 11-14.)

The instant petition was filed on April 22, 2011.

## II.  STATEMENT OF FACTS

The following background facts describing the crime and evidence presented at trial are from the opinion of the California Court of Appeal: [4]

> The primary witness for the prosecution was Luis Manuel Vargas.  At the time of trial, Vargas was 22 years old and had two children with Margarita Osuna, his common-law wife of six years.  On Friday March 19, 2004, he went to his mother's home in East Palo Alto to retrieve his car, a red Mustang that he'd bought about three weeks before from Rigoberto Alvarez.  Vargas learned when he bought the Mustang that someone previously shot at Alvarez as he was driving the car.  After Vargas retrieved the car and drove the car away from his mother's house, however, it stalled at a stop sign on Larkspur Street.  Suddenly, a car cut in front of his and blocked the road.  A young black man got out of the car, put a pistol to Vargas's head, and asked him if he claimed to be from the "Sac," a gang associated with Sacramento Street in East Palo Alto.  Vargas denied he was from the Sac Street gang.  Just at that point, another young black man who knew Vargas pulled up in a white Mustang and began yelling at the man with the gun that Vargas lives in Hayward and does not belong to the Sac.  Vargas had never seen the gunman before but knew the other man as a neighbor back when he lived in East Palo Alto.  The gunman removed the pistol from Vargas's head and drove off.  Vargas said the other man driving the white Mustang was known in the neighborhood as "Pooh."

> Vargas talked to Pooh for about fifteen minutes, and Pooh told him that there were problems right now between the Sac Street gang and a gang from the Alberini street area.

---

[4] This summary is presumed correct.  Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

United States District Court
Northern District of California

Vargas then drove to Alvarez's house to talk to him about getting rid of the red Mustang. Vargas parked in front of Alvarez's house, but Alvarez was not at home.  Just then, two individuals known to Vargas as "Tuli" (defendant Senituli Penisoni) and "Turtle" ([petitioner] Ricardo Arana) stopped to talk to Vargas.  Tuli and Turtle were in a blue van that Vargas had seen Tuli driving in the past.  Vargas told them he'd almost been killed on account of the red Mustang because someone put a pistol to his head thinking he was a member of the Sac Street gang.  Tuli and Turtle asked Vargas what the man looked like. When Vargas told them it was a black man with short hair, they said for sure it must be Dontae.[FN]  Vargas had never heard of Dontae.

[FN: Dontae Hurd was arrested for the murder of Lisa Hernandez, who was shot to death in East Palo Alto on June 21, 2003.  Lisa was in the passenger seat of a car driven by her boyfriend, Armando Valencia, known to police as a member of the Sac Street gang.  They were parked at a strip mall waiting to pick up Lisa's sister from work.  A man walked up to the car, called out "Yo, Sac Street" and fired.  Valencia was hit in the leg and Lisa died from a gunshot to the chest.  Valencia described the shooter as a short black male driving a small black car he recognized as associated with the Midtown Hogs, a gang from the Alberini area.  Subsequently, Valencia made a statement to Lisa's sister that Dontae was present but was not the shooter, so the police could take care of Dontae and Sac Street would take care of the shooter.  Valencia's statement resulted in dismissal of charges against Dontae Hurd.  Hurd was released around February 22, 2004, and returned to the Alberini district.]

Tuli asked Vargas to show him where the incident happened.  Vargas got in the passenger seat and Turtle moved to the back seat.  When he got into the van, Vargas saw Tuli had a gun right next to his leg.  Vargas said he "wasn't leery" because he'd "always seen them with guns" so it did not surprise him.  Moreover, an hour had gone by so he knew no one would be at the place where the incident happened.  Vargas directed Tuli towards the stop sign on O'Connor Street where he'd encountered the gunman.  After that, Tuli started to go back to Alvarez's house but then turned right down Wisteria Way.  Vargas noticed "a group of black people [who] were talking to a young man that was inside a car.  And then Tuli said to Turtle, 'Look at them niggers.' "  Vargas said the group of black people could not be seen from O'Connor Street.  He did not direct Tuli to turn right down Wisteria Way.

Regarding the shooting, Vargas stated:  "It happened very quickly, the van went next to the car and the shooting began."  He recalled hearing two shots just as the van pulled level with the blue car, then he ducked down to his left.  Tuli leaned over him and began firing a gun out the passenger side window.  From his position, Vargas could see towards the rear and he saw that Turtle was shooting out of the van too.  The firing stopped, Tuli pressed the accelerator, and then Vargas got up to see what was happening.  He noticed Turtle was still pointing his gun out of the van to the rear.  All of the van's windows were broken.

It seemed to Vargas that Tuli was lost because he made different turns and came back to the same place.  No one said anything.  They got to Pulgas Street and from there Tuli drove the van to an apartment complex and parked it.  Everyone got out of the van and Turtle began to gather up empty shell casings.  Vargas heard Tuli call his sister and tell her to report the van stolen.  Then Vargas grabbed his hat and walked off in one direction, and Tuli and Turtle walked off in the opposite direction.  Vargas saw them throw the casings

3

United States District Court
Northern District of California

over a fence next to the freeway.  Vargas never spoke to them about the shooting and did not see them again until he appeared in court.

Vargas said he did not have a gun that day and denied firing any shots from the van.  Before the shooting, neither Tuli nor Turtle told him they were going to shoot someone, or he would never have gone inside the van.  As he walked away from the van, Vargas was nervous thinking about what had just happened.  He picked up his car and drove home to Hayward.  He called his mother and told her everything that had happened.  He also told his wife Margarita about it.  Vargas said he was afraid defendants would harm him if he called the police because he knew they were in the Sac Street gang.

The shooting took place in front of a house on Wisteria Way in East Palo Alto, where Dellory Crooks testified he lives with his mother and brings his children, aged 10 and 6, every day after school.  Just prior to the shooting, Crooks stated he was out front talking with his friend, 43-year old Donald Prince, who had pulled up partially onto Crooks's driveway with his vehicle facing into the direction of oncoming traffic.  Prince's friend Sugar Ray Porter was with him in the front-passenger seat of the vehicle.  As the group conversed, Ortega Barnes drove down the street in a little four-door Toyota, drew up alongside and parallel to Prince's car, and joined the others.  As the four were chatting, a blue van drew up alongside Barnes's car.  Prince saw the barrel of a gun sticking out of the van and then the shooting began.  Crooks, Prince and Porter dove, scrambled and crawled to cover away from the vehicles.  Prince was shot in the leg.  Barnes was armed and returned fire at the van from his vehicle, but received multiple gunshot wounds to the chest and died shortly thereafter from his injuries.[FN]

[FN:  A P-85 Mark II .9mm Ruger semi-automatic pistol was found in Barnes's car and it was matched to 13 casings found at the scene.]

The prosecution called several other witnesses in its case-in-chief.  Clint Powell testified that he pulled his vehicle over on Wisteria because he'd spilled some soda.  In his rear-view mirror, he noticed a dark blue minivan coming up behind him.  There were at least two people in the van, maybe more – one of two occupants was Hispanic and the other was Samoan or Tongan.  Powell described the driver to the police as a Hispanic male adult with a very large build.

Tina Reed testified that she lives on Wisteria Way.  She heard some shots while she was out in front of her residence with a group of people.  Right after she heard the shots, she saw a van flying through a stop sign at about 45 m.p.h.  She noticed the back window and the front-passenger side-window were broken, and saw two persons in the front of the van and one in the rear.  Reed thought they were lost because she knew they were heading for a dead-end and would have to come back around to the same stop sign.  She saw the van again when it reappeared and described the driver as Mexican, with curly hair in a ponytail, big-shouldered and wearing a red shirt.

The prosecution also called several police officers and crime scene investigators who presented evidence pertinent to their investigation.  Evidence thus adduced showed that the shooting was called in to the police at 12:45 p.m. on Friday March 19, 2004.  At 1:35 p.m., the police received a call about a blue Ford Arrowstar van parked at the Light Tree

Apartment complex on East Bayshore.  At 1:45 p.m., defendant's (Tuli's) sister, Alice Penisoni, placed a 911 call to report that her blue Ford Arrowstar had been stolen. Sergeants Denton and Lopez of the San Mateo County Sheriff's Office went to interview Alice Penisoni in response to her 911 call.  By that time, police had examined the vehicle at the Light Tree apartment complex, had linked it to the shooting, and were suspicious about the timing of Alice Penisoni's stolen vehicle report.  Also, Denton knew the van was connected with the Penisoni household and had seen Tuli driving it in the past.  Upon contacting Alice, Denton challenged her story about the van having been stolen, told her the van had been involved in a shooting in which someone had died, and advised her to tell the truth.  Alice testified at trial that her bother Tuli phoned her on the day of the shooting and told her to call 911.  Tuli instructed her to tell the police she drove the van to the Stop 'n Shop on Bayshore and that it was stolen from there.  Alice said that Tuli came by the house once on Saturday or Sunday, ate and left, and did not sleep at the house again until he was arrested five days later.

On Sunday evening, police received a call from a female that Luis Vargas may have information about a homicide that occurred on Friday.  Police tried unsuccessfully to track the call.  On Tuesday March 23, police received a call from the same female subject who identified herself as Margarita Osuna.  She stated Luis Vargas was the father of their child, said he was at an address in Hayward and that he was planning on leaving the area.  Vargas was not at the address when police responded but was subsequently contacted after a vehicle driven by Rigoberto Alvarez was stopped.  Vargas was in the car with Alvarez and Jose Gutierrez.  Vargas agreed to talk to the police and was interviewed at length about the events of Friday March 19 by Detective Gary Ramos of the San Mateo County Sheriff's Office.

Detective Ramos began by asking Vargas what he'd done this past weekend.  Vargas seemed nervous.  At first he said he was at a friend's house in Redwood City on Friday. Detective Ramos did not think Vargas was being truthful because "he just seemed to be stumbling around, seemed to be able to forget things on Friday, but not on Saturday or Sunday."  Ramos challenged Vargas's statements but Vargas insisted he was telling the truth.  During a break, officers informed Detective Ramos they had just taken a statement from Vargas's mother and told Ramos what she had said.  Ramos then confronted Vargas, and told him that "either his mother was lying to me or he was lying to me about his involvement."  After that Vargas "just seemed to open up" – he broke down crying and told Ramos he would tell the truth.  Detective Ramos said Vargas was "quite concerned that if he did tell us the truth that himself or his family would be harmed."  Vargas identified defendants[5] to Ramos only as Tuli and Turtle, never by their surnames.  He described to Ramos what they wore at the time of the shooting, stating that Turtle wore a white T-shirt and dark pants or jeans with a red hat or sweatshirt, and that Tuli wore a black T-shirt and blue jeans.  After evaluating the information Vargas provided against what the police already knew about the shooting, Detective Ramos decided Vargas was "more of a witness in the case."  Ramos stated that Vargas was placed into the Witness Protection Program and relocated out of the area around December 2004 after the preliminary hearing.

---

[5]  All references to "defendants" in the Court of Appeal's opinion and in this order are to petitioner, Ricardo Arana, and his co-defendant, Senituli Penisoni.

United States District Court
Northern District of California

Several items of evidence recovered from the blue Ford van were also introduced into evidence by the prosecution.  A receipt from the Mi Rancho Market dated March 19 at 11:39 a.m. was lying across the ashtray in the front seat of the van.  A fingerprint found on the receipt was matched to the left index finger of [petitioner] ("Turtle").  [Petitioner's] prints were also found on a plastic bag found inside the van.  Detective Ramos went to the market and asked to see surveillance tapes from around that time of day.  On the tapes, [petitioner] is seen wearing a white T-shirt and dark pants, purchasing the items shown on the receipt at the time shown on the receipt, and leaving the store carrying the items in a white plastic bag.

People v. Arana, No. A115257, 2008 WL 4295100, *2-5 (Cal. Ct. App. Sept. 22, 2008).

### III.  DISCUSSION

A.    Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict."  Penry v. Johnson, 532 U.S. 782, 795 (2001) (internal citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  Williams, 529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A] federal

habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  Williams, 529 U.S. at 412.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous."  Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Here, as noted, the California Supreme Court summarily denied petitioner's petition for review.  The Court of Appeal, in its opinion on direct review, addressed seven of the claims petitioner raises in the instant petition.  The Court of Appeal thus was the highest court to have reviewed those claims in a reasoned decision, and, as to those claims, it is the Court of Appeal's decision that this Court reviews herein.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  The remaining claims were addressed by the San Mateo Superior Court on state habeas, and the Court reviews the superior court's decision as to those claims.  See id.

B.     Petitioner's Claims

As grounds for habeas relief, petitioner claims that:  (1) the trial court's failure to instruct on lesser-included offenses violated his right to due process; (2) the trial court violated his right to due process by excluding evidence of the victim's violent character; (3) the trial court violated his right to due process by admitting evidence of petitioner's gang activity committed after the charged offense; (4) the trial court's failure to instruct the jury sua sponte that accomplice testimony should be viewed with caution was error, and trial counsel's failure to request such an instruction violated petitioner's right to the effective assistance of counsel; (5) the instructions on attempted murder of a bystander violated his Sixth Amendment rights and his right to due process; (6) the cumulative prejudice from the foregoing errors violated petitioner's right to due process;

1   (7) the trial court imposed a sentence enhancement not authorized under California law, in

2   violation of petitioner's right to due process, and defense counsel's failure to object to the sentence

3   enhancement constituted ineffective assistance of counsel; (8) his right to due process was violated

4   because uncorroborated accomplice testimony was the only evidence supporting his conviction;

5   and (9) petitioner received ineffective assistance of counsel on appeal because appellate counsel

6   failed to raise claims seven and eight, above.  The Court addresses each claim in turn.[6]

7           1.      Lesser-Included Offense Instructions

8           Petitioner claims the trial court violated his right to due process by failing to give *sua*

9   *sponte* instructions on voluntary manslaughter and attempted voluntary manslaughter as lesser-

10  included offenses of, respectively, murder and attempted murder.  The state appellate court

11  disposed of this claim on state law grounds.

12          A defendant is entitled to an instruction on a theory of defense only "if the theory is legally

13  cognizable and there is evidence upon which the jury could rationally find for the defendant."

14  United States v. Boulware, 558 F.3d 971, 974 (9th Cir. 2009) (internal quotation and citation

15  omitted).  Due process does not require an instruction be given unless the evidence supports it.

16  See Hopper v. Evans, 456 U.S. 605, 611 (1982) (holding instruction on lesser-included offense

17  required only "when the evidence warrants such an instruction").  Moreover, "[a] state trial court's

18  refusal to give [a requested] instruction does not alone raise a ground cognizable in a federal

19  habeas corpus proceeding."  Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988).  "The error

20  must so infect the entire trial" that the petitioner was deprived of the fair trial guaranteed by the

21  Fourteenth Amendment.  Id.  "Whether a constitutional violation has occurred will depend upon

22  the evidence in the case and the overall instructions given to the jury."  Duckett v. Godinez, 67

23  F.3d 734, 745 (9th Cir. 1995).  The omission of an instruction is less likely to be prejudicial than a

24  misstatement of the law.  Walker v. Endell, 850 F.2d 470, 475-76 (9th Cir. 1987).  A habeas

25  petitioner whose claim involves a failure to give a particular instruction, as opposed to a claim that

26  involves a misstatement of the law in an instruction, bears an "'especially heavy burden.'"

27

28  _____
    [6] Petitioner voluntarily dismissed one other claim.  (See Dkt. No. 11.)

United States District Court
Northern District of California

1   Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (quoting Henderson v. Kibbe, 431 U.S.

2   145, 155 (1977)).

3          Here, the claim fails for at least three reasons.  First, petitioner fails to state a viable claim

4   for habeas relief because the failure of a state trial court to instruct on lesser-included offenses in a

5   non-capital case, such as this, does not present a federal constitutional claim.  Solis v. Garcia, 219

6   F.3d 922, 929 (9th Cir. 2000).

7          Second, the state appellate court determined that there was no substantial evidence to

8   support a manslaughter instruction.  Specifically, the court explained that under California law:

9          An intentional and unlawful homicide brought about by sudden quarrel or heat of
           passion is voluntary manslaughter if the killer's reason was actually obscured as the
10         result of a strong passion aroused by a provocation sufficient to cause an ordinary
           person of average disposition . . . to act rashly or without due deliberation and
11         reflection, and from this passion rather than from judgment.

12  Arana, 2008 WL 4295100 at *6 (citations and internal quotes omitted).  For the jury to conclude

13  that defendants were aroused by a provocation, it would have to infer that one of the victims fired

14  the first shots.  Id.  Based on the evidence adduced at trial, this would be mere speculation, and

15  therefore could not constitute substantial evidence.  Id.  This Court, having reviewed the record,

16  agrees with the state appellate court's finding that it is not reasonably probable that the jury could

17  have found defendants committed the lesser-included offenses of manslaughter or attempted

18  manslaughter.

19         Third and finally, even if the failure to instruct on the lesser-included offenses was

20  erroneous, petitioner cannot demonstrate that the error had a substantial or injurious effect in

21  determining the jury's verdict.  See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Messer v.

22  Runnels, No. 07-15151, 2009 WL 1464899, at *2 (9th Cir. 2009) (unpublished memorandum

23  disposition) (applying Brecht in a non-capital case to a claim that the trial court failed to instruct

24  on the lesser-included offense of involuntary manslaughter); Ghent v. Woodford, 279 F.3d 1121,

25  1133-34 (9th Cir. 2002) (applying Brecht to a capital case for failure to instruct the jury on a

26  lesser-included offense).  Because the jury found all the elements to convict petitioner of the

27  greater offenses of first degree murder and attempted murder, the failure to give instructions on the

28  lesser-included offenses did not actually result in prejudice.  See Brecht, 507 U.S. at 637.

United States District Court
Northern District of California

9

United States District Court
Northern District of California

1    Accordingly, petitioner is not entitled to federal habeas relief on this claim.

2        2.    Exclusion of Evidence of Victim's Violent Character

3    Petitioner claims that the trial court erred in granting the prosecutor's motion in limine to

4  exclude evidence of victim Barnes's prior bad acts and criminal record, and thereby denied

5  petitioner his right to present a defense.  Specifically, the prosecutor moved to exclude a videotape

6  of a drive-by shooting occurring several weeks before the underlying crime.  The videotape

7  showed a car similar to Barnes's, and someone shooting from the driver's side toward an oncoming

8  car.  After Barnes's death, the gun recovered from his car matched the casings recovered from the

9  videotaped shooting.  Petitioner argued that the evidence of the earlier drive-by shooting should be

10 admitted to demonstrate the possibility of some prior personal disagreement between Barnes and

11 Vargas rather than any gang activity.  The trial court deferred ruling on the motion until there was

12 further evidence, and until the defense could show that Barnes's prior record was relevant.  The

13 trial court also directed that defense counsel would have to provide some kind of link between the

14 drive-by shooting and the underlying criminal case.  Petitioner's trial counsel conceded that "that's

15 fair."  Arana, 2008 WL 4295100 at *7.

16   Later, during the prosecution's case-in-chief, the prosecutor moved to admit evidence of

17 defendants' gang associations to show motive for shooting.  The parties again discussed the

18 videotaped drive-by shooting, and the trial court stated:

19        Well, . . . a trial's a search for the truth and if the allegations are that [defendants]
20        are doing something to promote the Sac Street gang's interests at the expense of the
         Mid Town Hogs, then it should be explained I think that Mr. Barnes was an active
21        member of that gang and the other truthful things that occurred on that day should
         come out, which is that he was firing back at them, he had other weapons and
22        paraphernalia.  [¶]  I would agree that the earlier shooting is irrelevant because no
         one can say with any certainty that's him and whether or not he has a prior record
23        [may] or not be relevant. . . .  So we would have to wait to, if that evolves as the
         defense then someone can ask to bring a motion to introduce evidence that would
24        be relevant in that sense, ….

25 Arana, 2008 WL 4295100 at *8.

26   The state appellate court denied petitioner's claim, concluding that he failed to preserve it

27 for appeal:

28        First, defendants' claim fails at the threshold because it was not preserved for

10

appeal.  As the colloquies recited above demonstrate, counsel accepted the trial court's ruling that evidence of Barnes's alleged involvement in an earlier drive by shooting was irrelevant absent an assertion of self-defense, subject to a further offer of proof that it was relevant on some other basis, such as evidence of a prior personal dispute between Barnes and Vargas.  Having failed to make any such further offer of proof, defendants may not object at this point to the exclusion of the evidence.  [Citations.]

Defendants now assert, for the first time on appeal, that evidence of Barnes's criminal record and involvement in another drive-by shooting was relevant and admissible as further support for the idea that Barnes, not defendants, fired the first two shots.  However, defendants never presented this theory of relevance to the trial court and may not predicate error on a theory they did not present below.  [Citations.]

Arana, 2008 WL 4295100 at *9.

Respondent argues that this claim is procedurally defaulted.  A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment.  See Coleman v. Thompson, 501 U.S. 722, 729-30 (1991).  In cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred.  See id. at 750.  The rule cited here by the Court of Appeal, specifically, that a defendant must make a contemporaneous objection at trial in order to preserve an issue on appeal, has been found to be a sufficiently independent and adequate procedural rule to support the denial of a federal petition on grounds of procedural default.  See Paulino v. Castro, 371 F.3d 1083, 1092-93 (9th Cir. 2004) (finding claim procedurally defaulted based on California's contemporaneous objection rules).

The procedural bar here arises from California Evidence Code section 354.  Section 354 requires that petitioner make the "substance, purpose, and relevance of the excluded evidence" known to the trial court to preserve the issue for appellate review.  Petitioner could also satisfy section 354 by demonstrating that making an offer of proof to the trial court would have been futile.  Cal. Evid. Code § 354(b).  Petitioner did not do either of these at trial.  This Court agrees with several sister courts that California Evidence Code section 354 is an adequate and independent state procedural rule.  Williams v. Sisto, No. 07-5342 CW, 2010 WL 530086, at *8-9 (N.D. Cal. Feb. 8, 2010) (holding that Cal. Evidence Code § 354, regarding failure to make proper

offer of proof at trial, constitutes independent and adequate state procedural rule under <u>Wainright</u> <u>v. Sykes</u>, 433 U.S. 72, 87-88 (1977)); <u>Rogan v. Henry</u>, No. 97-4460 BZ, 1999 WL 375603, at *3-4 (N.D. Cal. June 4, 1999) (concluding that California Evidence Code § 354 was independent and adequate state bar).  This claim is procedurally barred.[7]

Alternatively, even if this claim were not procedurally barred, petitioner would not be entitled to federal habeas relief.  The constitutional right to present a complete defense includes the right to present evidence.  <u>Jackson v. Nevada</u>, 688 F.3d 1091, 1096 (9th Cir. 2012).  The right is only implicated, however, "when the evidence the defendant seeks to admit is 'relevant and material, and . . . vital to the defense.' "  <u>Id.</u> (quoting <u>Washington v. Texas</u>, 388 U.S. 14, 16 (1967)).  Where a state criminal defendant asserts that the exclusion of evidence at trial violated his right to present a defense, a federal habeas court must consider the value of the evidence in relation to the purposes purportedly served by its exclusion to determine whether a constitutional violation has occurred.  <u>Id.</u> at 8666.

Here, petitioner's defense was an alibi.  At trial, Penisoni testified that the van involved in the shooting was his family's van.  (Ex. 3 at 2038-63.)  According to Penisoni, on the morning of the shooting, he and Arana used the van to drive to the residence of a friend, Little Ton.  (<u>Id.</u>)  At some point, another friend, Aaron Kelly, went out to the van to retrieve a hand towel, and when he returned, Kelly told them he saw someone driving away with Penisoni's van.  (<u>Id.</u>)  Because Penisoni was "high," he did not want to call the police or his dad at that time.  (<u>Id.</u>)  Shortly after, Arana and Penisoni heard a report of a shooting on the police scanner, and then heard a description of the vehicle involved, which was Penisoni's van.  (<u>Id.</u>)  Petitioner did not testify at trial, but he argued that Vargas, Alvarez, and Jose Gutierrez, were the shooters in Penisoni's van.  (Ex. 3 at 3367-81.)  He argued that Vargas stole Penisoni's van and that Vargas wanted to retaliate for having a gun put to his head.  (<u>Id.</u>)

It is difficult to ascertain how admission of evidence implicating Barnes in a prior drive-by

---

[7] Although a petitioner may avoid procedural default by showing cause for the default and actual prejudice as a result of the alleged violation of federal law, or by showing the failure to consider the claims will result in a fundamental miscarriage of justice, <u>see</u> <u>Coleman</u> 501 U.S. at 750, petitioner here has neither made, nor tried to make, such a showing.

shooting, or Barnes's prior criminal history, would be "vital" to the defense theory of alibi.  The California Court of Appeal determined that, even if petitioner had properly preserved this claim for appeal, there was no error because petitioner failed "either to assert a claim of self-defense or to show it was relevant to another material issue in the case, such as a prior or ongoing dispute between Vargas and the victim that might indicate Vargas had a motive to commit the crime." Arana, 2008 WL 4295100 at *9.  The state appellate court's conclusion was not unreasonable.

Accordingly, petitioner is not entitled to federal habeas relief on this claim.

### 3.      Admission of Evidence of Gang Activity

Petitioner claims that admission of his gang association was more prejudicial than probative, and violated his right to due process by rendering his trial fundamentally unfair.  The state appellate court rejected his arguments based on state law, and concluded that "[a]ny danger of undue prejudice was strictly limited by the trial court's instructions that the evidence could only be considered for motive, and that the jury was not to be influenced by passion or prejudice." Arana, 2008 WL 4295100 at *14.

Petitioner's claim does not warrant federal habeas relief.  The United States Supreme Court has never held clearly that the introduction of propensity or other allegedly prejudicial evidence violates due process.  See Estelle v. McGuire, 502 U.S. 62, 75 n.5 (1991) ("we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime"); Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (the United States Supreme Court "has not yet made a clear ruling that admission of irrelevant or overly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ").  Because there is no Supreme Court precedent that controls on the legal issue raised by petitioner, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law.  Carey v. Musladin, 549 U.S. 70, 77 (2006).

In addition, this circuit has held that the admission of prejudicial evidence may violate due process, but "[o]nly if there are no permissible inferences the jury may draw from the evidence." Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991).  Gang evidence is admissible when

13

relevant to a material issue in a case.  United States v. Abel, 469 U.S. 45 (1984) (gang evidence admissible to show bias); see also Windham v. Merkle, 163 F.3d 1092, 1103-04 (9th Cir. 1998) (gang evidence relevant to establish motive for crimes).

Here, the state appellate court concluded that, according to state law, the gang evidence was relevant to the material issue of motive.  Because this inference is permissible, the admission of the gang evidence did not violate due process.  See Jammal, 926 F.2d at 920.  Further, the jury was specifically instructed that the gang evidence could only be considered for the limited purpose of establishing a possible motive for the shooting.  See Weeks v. Angelone, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions.").

Even assuming the gang evidence was improperly admitted, the error did not have "a 'substantial and injurious effect' on the verdict." Brecht, 507 U.S. at 623.  Vargas was in the van at the time of the shooting with Penisoni and petitioner, identified both of them as the shooters, and described the events leading up to and during the shooting in detail.  (Ex. 3 at 1484-1507.)  A supermarket surveillance tape showed petitioner purchasing food at 12:12 p.m. the day of the shooting, and petitioner's fingerprint was on the food receipt left in Penisoni's van.  (Id. at 818, 942, 946, 950.)  Within the next half hour, just before 12:45 p.m., people inside Penisoni's van fired upon the victims, killing Barnes.  (Id. at 1368, 3300.)  Witnesses Clint Powell's and Tina Reed's descriptions of the driver of the van at the time of the shooting were plausible matches to Penisoni's appearance.  (Id. at 498, 551-61.)  At 1:35 p.m., the van was found abandoned.  (Id. at 3301-02.)  Officer Denton recognized the van as being connected to Penisoni's family and had seen Penisoni driving it previously.  (Id. at 1141-42.)  Ten minutes later, Penisoni's sister called the police to falsely report – on Penisoni's urging – that the van was stolen.  (Id. at 1262-70, 1464.)  Given the strong evidence against petitioner, petitioner cannot demonstrate that, absent the gang evidence, it is reasonably probable that the jury would have voted to acquit.

Accordingly, petitioner is not entitled to federal habeas relief on this claim.

4.     Instruction on Accomplice Testimony

a.     Trial Court's Failure to Instruct Sua Sponte

Petitioner claims that the trial court violated his right to due process by failing to instruct

United States District Court
Northern District of California

14

the jury that Vargas's testimony should be viewed with caution because he was an accomplice.

The Court first notes that it is not clear that Vargas was an accomplice.  Defendants asserted on appeal that Vargas provided the information that instigated the search for Dontae Hurd and that Vargas voluntarily accompanied defendants knowing they were armed and knowing they were going to look for the man who put a gun to Vargas's head.  Arana, 2008 WL 4295100 at *14.  There is no evidence in the record, however, to show that Vargas intended to accompany the shooters in an effort to retaliate against the man who had threatened him.  Rather, Vargas testified that he had never heard the name Dontae before the day of the shooting.  (Ex. 3 at 1498.)  When asked why he got into the van, Vargas replied, "Because they told me to go and show them and he had – an hour had gone by and I knew no one was going to be there.  And I went to show them.  I thought they were going – there weren't going to be any problems."  (Id. at 1575.)  Further, as noted above, Sergeant Ramos interviewed Vargas and determined that he was a witness rather than a suspect.

Even if Vargas was an accomplice, however, there is no constitutional requirement that juries be cautioned about an accomplice witness' credibility.  The use of accomplice testimony is certainly acceptable under due process.  See United States v. Augenblick, 393 U.S. 348, 352 (1969) ("When we look at the requirements of procedural due process, the use of accomplice testimony is not catalogued with constitutional restrictions.").  Indeed, "[t]he uncorroborated testimony of an accomplice is enough to sustain a conviction unless the testimony is incredible or unsubstantial on its face."  United States v. Lopez, 803 F.2d 969, 973 (1986).  The Supreme Court has not determined, moreover, that when accomplice testimony is used, a cautionary instruction about the reliability of such testimony is constitutionally required.  As a result, petitioner's claim fails on this ground.  See 28 U.S.C. § 2254(d)(1) (restricting habeas relief to violations of clearly established federal law determined by the United States Supreme Court).

In any event, any error from failing to provide the instruction was not prejudicial.  Here, the state appellate court found there was ample evidence apart from Vargas's testimony to establish defendants' guilt:

Here, Vargas's testimony was sufficiently corroborated by independent evidence.

United States District Court
Northern District of California

15

The van driven by defendant Tuli Penisoni and abandoned at the Light Tree Apartments was identified as the vehicle involved in the drive-by shooting. Various spent .9 mm casings were found in and around the van, which forensics established as having been fired from the same two .9 mm pistols. A spent casing found beside the murder victim's (Barnes's) car was fired from one of those same two .9 mm pistols. Defendant Arana was placed in the van a short time before the shooting because his fingerprints were on the Mi Rancho market receipt found inside the van. His prints were also on a plastic bag found inside the van. The surveillance tape from the market shows Arana in clothing matching the description provided by Vargas. It shows him purchasing the items listed on the receipt later found inside the van, and leaving the store with those items in a white plastic bag like the one found later in the van with his prints on it.

In addition, Vargas's testimony is corroborated as to Penisoni by the latter's consciousness of guilt as evidenced by his attempts to deceive the police into believing the van had been stolen before the shooting. [Citation.] After abandoning the van, Penisoni phoned his sister Alice and told her to call 911 and lie to the police that she had driven the van to Stop N' Shop and it had been stolen from there. Further, upon cross-examination at trial, Penisoni admitted that in his letter to Mike Monje (recovered in the search of Monje's cell) he'd written, "Everything look cool for me and Rick [because] they ain't got no F .P.'s or no M.W.'s, you dig." Penisoni admitted he was telling Monje it looks cool for him and Rick because the police had found no fingerprints or murder weapons. In sum, the evidence adduced at trial sufficiently corroborated Vargas's testimony about the involvement of both defendants in the crime. Therefore, any error in failing to instruct on accomplice liability was harmless.

Arana, 2008 WL 4295100 at *15. An independent review of the record shows that the state appellate court's conclusion was not unreasonable.

Accordingly, petitioner is not entitled to federal habeas relief on this claim.

b.      Ineffective Assistance of Counsel

Petitioner claims that his trial counsel was ineffective for failing to request that the jury be instructed on accomplice testimony.

Claims of ineffective assistance of counsel are examined under Strickland v. Washington, 466 U.S. 668 (1984). In order to prevail on a claim of ineffectiveness of counsel, a petitioner must establish two factors. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms, id. at 687-68, "not whether it deviated from best practices or most common custom," Harrington v. Richter, 131 S. Ct. 770, 788 (2011) (citing Strickland, 466 U.S. at 690 ). "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was

within the 'wide range' of reasonable professional assistance." Id. at 787 (quoting Strickland, 466 U.S. at 689).

Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Id.  Where the petitioner is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.  "The likelihood of a different result must be substantial, not just conceivable." Richter, 131 S. Ct. at 792 (citing Strickland, 466 U.S. at 693).  It is unnecessary for a federal court considering an ineffective assistance of counsel claim on habeas review to address the prejudice prong of the Strickland test if the petitioner cannot establish incompetence under the first prong.  Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998).

The standards of both 28 U.S.C. § 2254(d) and Strickland are "highly deferential  . . . and when the two apply in tandem, review is doubly so." Richter, 131 S. Ct. at 788 (quotation and citations omitted).  "The question [under § 2254(d)] is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

Petitioner's ineffective assistance of counsel claim, premised on counsel's failure to request an instruction on accomplice testimony, was first raised on state habeas.  The only court to have reviewed the claim in a reasoned decision was the San Mateo County Superior Court.  (Ex. 11.) The superior court determined that defense counsel did not render ineffective assistance because a trial court is already required to give accomplice instructions sua sponte when the evidence warrants them.  (Id. at 4 (citing People v. Zapien, 4 Cal. 4th 929, 982 (1993)).  The superior court further determined, for the same reasons found by the state appellate court, that petitioner suffered no prejudice.  (Id.)

The Court concludes that Petitioner's counsel's failure to request an accomplice instruction was not objectively unreasonable.  Defense counsel could have reasonably determined that the

17

United States District Court
Northern District of California

evidence did not warrant such instruction given that, as discussed above, the record is not clear that Vargas was an accomplice.  As also discussed above, petitioner's main defense was alibi. Consequently, defense counsel could have reasonably determined that Vargas's complicity was not a major part of the defense case and might have even hurt the case by suggesting to the jury that Vargas was Petitioner's accomplice in the commission of the crime.

Finally, as also discussed above, the state appellate court reasonably determined that Vargas's testimony was sufficiently corroborated by independent evidence.  Thus, even assuming arguendo counsel was deficient by failing to request an accomplice instruction, such failure did not prejudice his client.

Accordingly, petitioner is not entitled to federal habeas relief on this claim.

5.       Instruction on Attempted Murder

The trial court instructed the jury on the three counts of attempted murder, pursuant to CALJIC No. 8.66.1, as follows:

> With respect to the attempted murders alleged in counts II, III, & IV, a person who primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk.  This zone of risk is termed the "kill zone." The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator intended to kill the primary victim by killing everyone in that victim's vicinity.  [¶]  Whether a perpetrator actually intended to kill the victim, either as a primary target or as someone within a "kill zone" zone of risk is an issue to be decided by you.

(Ex. 1 at 629.)  Petitioner claims that the instruction allowed the jury to presume two necessary elements of the crime:  (1) specific intent to kill, and (2) knowledge that there were other people in the vicinity of the intended murder victim.

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'"  Id. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a

whole and the trial record.  Id.  Petitioner also must show actual prejudice from the error, i.e., that the error had a substantial and injurious effect or influence in determining the jury's verdict, before the court may grant federal habeas relief.  Calderon v. Coleman, 525 U.S. 141, 146 (1998) (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

Here, the state appellate court rejected petitioner's instructional error claim, finding that the trial court's instructions were accurate.  The court explained that CALJIC No. 8.66.1 was taken from People v. Bland, 28 Cal. 4th 313 (2002):

> *Bland* involved a gang-related shooting in which defendant and another man fired into a moving vehicle, killing the driver and wounding both passengers.  (*Bland, supra*, 28 Cal.4th at p. 318.)  Defendant was convicted of first degree murder, plus two counts of premeditated attempted murder.  The court of appeal reversed his attempted murder convictions because the trial court erroneously instructed the jury on the doctrine of transferred intent.  (*Ibid.*)
>
> The Supreme Court agreed that the specific intent to kill cannot be transferred "from an intended victim to an unintended victim" when the charge is attempted murder  (*Bland, supra*, 28 Cal.4th at p. 326) because to be guilty of attempted murder "the defendant must intend to kill the alleged victim, not someone else."  (*Id.* at p. 328.)  Nevertheless, the Court stated that "a person who shoots at a group of people ... even if that person primarily targeted only one of them ... might still be guilty of attempted murder of everyone in the group" under a theory of concurrent intent.  (*Bland, supra*, 28 Cal.4th at p. 329.)  The Court explained "that although the intent to kill a primary target does not transfer to a survivor, the fact the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within what it termed the 'kill zone.' 'The intent is concurrent ... when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity."  (*Ibid.*)

Arana, 2008 WL 4295100 at *17.  The state appellate court reasonably found there was sufficient evidence to support a finding of concurrent intent given that all the victims were close enough for defendants to create a kill zone.

With regard petitioner's contention that CALJIC No. 8.66.1 erroneously presumed knowledge, the state appellate court analyzed People v. Vang, 87 Cal. App. 4th 554 (2001):

> In *Vang*, defendants were convicted of 11 counts of attempted murder after they fired multiple rounds from high-powered assault rifles at two separate residences.  (*Vang, supra,* 87 Cal.App.4th at pp. 558, 563.)  Defendants contended the evidence was insufficient to show they intended to kill anyone other than one person at each residence, "due to the location of bullets centered around the area where [the intended victim at each residence] could be seen from the street."  (*Id.* at p. 563.)

The Court of Appeal in *Vang* rejected defendants' contention, holding that "malice aforethought 'is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.' [D]efendants manifested a deliberate intention to unlawfully take the lives of others when they fired high-powered, wall-piercing, firearms at inhabited dwellings. The fact they could not see all of their victims did not somehow negate their express malice or intent to kill as to those victims who were present and in harm's way, but fortuitously were not killed." (*People v. Vang, supra*, 87 Cal.App.4th at p. 564.)

Arana, 2008 WL 4295100 at *18-19. The state appellate court reasonably found there was sufficient evidence to support a finding of knowledge given Vargas's testimony that he could see a group of people as defendants' vehicle drove down Wisteria Way and that he heard Tuli say "Look at them niggers," just before shooting began. While the state appellate court acknowledged that Vang pre-dated Bland, it noted that the Bland Court stated that Vang can be considered "a kill zone case." Id. The court concluded that "Under the law of concurrent intent developed pursuant to *Vang* and *Bland*, there is no legal requirement that a defendant must be aware of all the potential victims in a kill zone in order to be convicted on multiple counts of attempted murder." Id.

In sum, the California courts have conclusively resolved the issue against petitioner. This Court must defer to the California courts' interpretation of its law on attempted murder. See Estelle, 502 U.S. at 67-68 (holding federal writ not available for alleged error in the interpretation or application of state law); Aponte v. Gomez, 993 F.2d 705, 707 (9th Cir. 1993) (holding federal courts are "bound by a state court's construction of its own penal statutes"); Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). Regardless, the state court denial of this claim was not an unreasonable application of clearly established federal law.

Accordingly, petitioner is not entitled to federal habeas relief on this claim.

6.      Cumulative Error

Petitioner reiterates the alleged errors discussed above and claims that, when added together, they show the trial as a whole was a violation of due process. In other words, petitioner relies on cumulative error. For the reasons discussed above, the Court has found no constitutional

1   error exists, let alone multiple errors.  When there is no single constitutional error, "there is

2   nothing to accumulate to a level of constitutional error."  <u>Mancuso v. Olivarez</u>, 292 F.3d 939, 957

3   (9th Cir. 2002).

4          Accordingly, petitioner is not entitled to federal habeas relief on this claim.

5          7.      <u>Sentencing Error</u>

6                  a.      <u>Due Process</u>

7          Petitioner argues that the sentencing enhancement for personally discharging a firearm

8   during the attempted murders (Penal Code § 12022.53(c)) was unauthorized because he was not

9   found to be in violation of Penal Code § 186.22(b).

10         Penal Code § 12022.53(c) provides:

11         Notwithstanding any other provision of law, any person who, in the commission of a
    felony specified in subdivision (a), personally and intentionally discharges a firearm, shall
12         be punished by an additional and consecutive term of imprisonment in the state prison for
    20 years.

13  Penal Code § 12022.53(c).[8]

14

15         Petitioner relies on Penal Code § 12022.53(e)(1), which provides:

16         The enhancements provided in this section shall apply to any person who is a principal in
    the commission of an offense if both of the following are pled and proved:

17         (A) The person violated subdivision (b) of Section 186.22.

18         (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d).

19  Penal Code § 12022.53(e)(1).

20         Penal Code § 186.22(b) provides for additional penalties where a felony is committed for

21  the benefit of a criminal street gang.  It was not pleaded in the information filed against petitioner.

22  (<u>See</u> Ex. 1 at 3-15.)  Petitioner's sentencing error claim was first raised on state habeas.  The only

23  court to have reviewed the claim in a reasoned decision was the San Mateo County Superior

24  Court.  (Ex. 11.)  The superior court rejected the claim, reasoning as follows:

25

26  _____

27  [8] Penal Code § 12022.53(a)(1) lists murder as one of the specified felonies, and
    § 12022.53(a)(18) lists "[a]ny attempt to commit a crime listed in this subdivision other than an
28  assault."

United States District Court
Northern District of California

Penal Code § 12022.53(c) does not require that the person to whom the enhancement is being applied be found in violation of PC § 186.22(b). Penal Code § 12022.53(e) provides for an enhancement if the defendant is both found to be in violation of PC § 186.22(b) and any principal in the offense committed any act specified in subdivision (b), (c), or (d). However, in finding true the PC § 12022.53(c) allegation, the jury necessarily found that Petitioner personally discharged a firearm in the commission of an enumerated felony, and therefore it was not necessary to determine whether subdivision (e) was applicable.

(Ex. 11 at 3-4.)

Here, petitioner does not refer to any federal law or constitutional provision in his petition with respect to his sentencing error claim. Rather, he alleges error under state law only. As discussed, federal habeas relief is unavailable for violations of state law or for alleged error in the interpretation or application of state law. See Estelle, 502 U.S. at 67-68; Aponte, 993 F.2d at 707.

Further, petitioner's reading of the statute simply does not make sense. Under petitioner's reading, a firearm enhancement could only apply to cases where a defendant is a member of a criminal street gang. Petitioner provides no authority for this. Rather, California law interprets section 12022.53(e) as a statute limiting when a defendant can be subjected to both firearm and gang enhancements simultaneously without violating statutory prohibitions against multiple punishment for crimes. See People v. Robinson, 208 Cal. App. 4th 232, 261 (2012); People v. Brookfield, 47 Cal. 4th 583, 594 (2009). Here, all of the elements for petitioner's "personal use" of a firearm were satisfied. Thus, the state court's rejection of this claim was reasonable, and is entitled to AEDPA deference.

Accordingly, petitioner is not entitled to federal habeas relief on this claim.

b.      Ineffective Assistance of Counsel

Petitioner claims that his trial counsel was ineffective for failing to object to the above alleged sentencing error. Said claim was also considered and rejected by the state superior court on state habeas. (Ex. 11 at 3-4.)

Here, petitioner's claim of ineffective assistance of counsel arises from an issue the Court has discussed and found unavailing. In particular, petitioner challenges his attorney's failure to object to a sentencing enhancement that this Court has found was properly imposed. Under such circumstances, petitioner is unable to meet either prong of the Strickland test. See Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005) ("[T]rial counsel cannot have been ineffective for

United States District Court
Northern District of California

22

1    failing to raise a meritless objection.")

2         Accordingly, petitioner is not entitled to federal habeas relief on this claim.

3         8.    Insufficient Evidence

4         Petitioner claims that the evidence was insufficient to support his conviction when viewed

5    without the uncorroborated accomplice testimony of Vargas.  Said claim was also considered and

6    rejected by the state superior court on state habeas.  (Ex. 11 at 5.)

7         The Due Process Clause "protects the accused against conviction except upon proof

8    beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

9    charged." In re Winship, 397 U.S. 358, 364 (1970).  Consequently, where a state prisoner alleges

10   the evidence in support of his state conviction cannot be fairly characterized as sufficient to have

11   led a rational trier of fact to find guilt beyond a reasonable doubt, such petitioner states a

12   constitutional claim, Jackson v. Virginia, 443 U.S. 307, 321 (1979), which, if proven, entitles him

13   to federal habeas relief, id. at 324.  For purposes of determining such claim, the relevant inquiry is

14   whether, "after viewing the evidence in the light most favorable to the prosecution, any rational

15   trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id.

16   at 319 (emphasis in original).  Where the record supports conflicting inferences, a federal habeas

17   court must presume the trier of fact resolved any such conflicts in favor of the prosecution, and

18   must defer to that resolution.  Id. at 326.  Only if no rational trier of fact could have found proof of

19   guilt beyond a reasonable doubt, may the writ be granted.  Id. at 324.

20        Petitioner appears to reiterate his claim above that the jury should have been instructed to

21   view Vargas's testimony with caution insofar as Vargas was an accomplice.  As discussed above,

22   it is not clear from the record that Vargas was an accomplice, and in any event, the admission of

23   Vargas's testimony did not violate any federal law.  Corroboration of an accomplice is a state law

24   requirement.  See Laboa v. Calderon, 224 F.3d 972, 979 (2000).  As also discussed above, the

25   state appellate court found that Vargas's testimony was sufficiently corroborated by independent

26   evidence.

27        Accordingly, the evidence at trial included both Vargas's testimony and the independent

28   evidence linking defendants to the crime.  A rational trier of fact could determine that, taken

United States District Court
Northern District of California

1    together, the evidence supported a finding that petitioner committed the drive-by shooting.

2         Accordingly, petitioner is not entitled to federal habeas relief on this claim.

3         9.    Ineffective Assistance of Appellate Counsel

4         Petitioner claims he received ineffective assistance of counsel on appeal because appellate

5    counsel failed to raise claims seven and eight, above.  Said claim was also considered and rejected

6    by the state superior court on state habeas.  (Ex. 11 at 5.)

7         The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant

8    effective assistance of counsel on his first appeal.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).

9    Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out

10   in Strickland.  See Strickland, 466 U.S. at 668; Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.

11   1989).  A petitioner thus must show his counsel's advice fell below an objective standard of

12   reasonableness and that there is a reasonable probability that, but for counsel's unprofessional

13   errors, he would have prevailed on appeal.  Miller, 882 F.2d at 1434 & n.9.

14        Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue

15   requested by a criminal defendant.  Jones v. Barnes, 463 U.S. 745, 751-54 (1983).  "[T]he weeding

16   out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy."

17   Miller, 882 F.2d at 1434.  Consequently, where appellate counsel "decline[s] to raise a weak

18   issue," he or she will "frequently remain above an objective standard of competence" and, for the

19   same reason, will have caused his client no prejudice.  Id.

20        Again, petitioner's claim of ineffective assistance of counsel arises from issues the Court

21   has discussed above and found unavailing.  Specifically, the Court has already found that the

22   Penal Code § 12022.53(c) enhancement was properly imposed, that trial counsel was not

23   ineffective in failing to object to the enhancement, and that there was sufficient evidence to

24   support the conviction.  Because raising these claims on appeal would have been unsuccessful,

25   appellate counsel was not ineffective in declining to do so.

26        Accordingly, petitioner is not entitled to federal habeas relief on this claim.

27

28

United States District Court
Northern District of California

24

C.    Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  See Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  Id. § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## IV.  CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

Additionally, the Clerk is directed to substitute Randy Grounds on the docket as the respondent in this action.

**IT IS SO ORDERED.**

Dated:  January 9, 2014

_____
JON S. TIGAR
United States District Judge